## Board of Drainage Commissioners, of Hopkins County, et al. v. H. J. Peterson & Company, et al.

(Decided October 20, 1922.)

### Appeal from Hopkins Circuit Court.

1. Drains—Action for Damages Upon Contract to Construct Ditch.— In suit for damages on a written contract to construct a drainage ditch, evidence examined and held not to sustain the trial court's finding that the owner had overpaid the contractor, and thereby released the surety of the latter, or the contention that plaintiff failed to prove any damage.

2. Drains—Action for Damages Upon Contract to Complete Ditch.— Evidence also held to show such abandonment of the contract by the contractor as to warrant the owner to relet the work to another and to sue the contractor and its surety for the entire damages; the contract having provided for the completion of the work within a specified time and there being a failure not only to comply with this provision but a clear demonstration of inability and lack of intention to further attempt its completion within a reasonable time thereafter.

COX & GRAYOT and LAFFOON & WADDILL for appellants.

GORDON, GORDON & MOORE and J. R. HAYS for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Reversing.

A drainage district having been established, and the construction of a ditch known as "Otter Creek Public Ditch" having been ordered pursuant to the drainage act of 1912, section 2380, Kentucky Statutes, the appellants, the drainage commissioners of the county, in accordance with subsection 26 of the act, entered into a written contract on February 3, 1919, with appellees Peterson Company as principal, and the Southern Surety Company as its surety, for the construction of the ditch, estimated to cost $27,108.70.

The contract provides that the work should be completed in the year 1919, in accordance with the plans and specifications. The work not having been completed

within that time, and the contractor having done no work thereon after about December 1, 1919, appellants relet the contract to J. H. Church on April 3, 1920, and on September 9, 1920, instituted this action for damages against the original contractor and its surety.

After the issues had been formed, proof was taken by deposition, a jury waived and the case submitted to the court by agreement, resulting in a judgment dismissing the petition, from which plaintiffs have appealed.

As a basis for the judgment the court stated separately, in writing, its findings of fact and law, as follows:

"The court finds, that from the evidence that plaintiff had given no notice that it intended to declare the contract forfeited or cancelled; that the time was not of the essence of such contract, that the plaintiff without the knowledge or consent of the surety and in contravention of its rights, overpaid the H. J. Peterson Company in the sum of $1,900.00. The court finds as matter of law that the plaintiff had no right or authority to declare said contract forfeited or cancelled without notice to each defendant; that time was not of the essence of the contract, and that by overpaying the H. J. Peterson Company, as found above, the Southern Surety Company was released from all liability as surety in said contract."

The appellants contend that the court erred in each of its findings of both law and fact, while the appellees insist that the court found correctly in each instance, and in addition, that the judgment should be affirmed in any event, because of a total failure of plaintiffs to prove, even approximately, the amount of damages, if any, sustained by the district.

We are unable to find any evidence whatever in the record to sustain the court's finding that plaintiffs overpaid the contractor $1,900.00 or any other sum, and we may therefore eliminate from consideration the court's conclusion of law that because of such overpayment the surety was released. The only evidence cited by counsel for appellees to sustain this finding of fact consists of statements by witnesses for plaintiffs that the contractor had not completed more than about one-fourth of his contract according to plans and specifications, and that he had been paid, as the contract provides, 80% of the monthly estimates of the engineer for work performed by him.

The argument that this proof shows an overpayment to the contractor is based upon the erroneous assumption that the witnesses meant that of the work performed by the contractor only about one-fourth of it was done according to the plans and specifications, and that in paying him 80% of the value thereof he was paid the 80% for all of his work, whereas he should have been paid only 80% of one-fourth of what he had done, since only one-fourth of it was done according to plans and specifications. The witnesses, however, were careful to explain, and no one contradicts, that all of the work performed by the contractor, and for which he was paid 80% of the contract price, was required to be done by the contract, but the places where the work was done were not completed according to plans and specifications, except as to about 25% thereof.

What happened was, that the contractor, at several places, cut the ditch not so wide or so deep as he was required to do, but all of the excavations made by him and for which he was paid were required by the contract, hence he neither did nor was paid for any work except in strict accordance with the contract, although by not completing the excavations at many places to the required width and depth he did not, as the witnesses stated, *complete* more than about one-fourth of the work according to plans and specifications.

It is very clear, however, that only having been paid for 80% of the work actually done by him, and all of this work being required under the plans and specifications, there was no overpayment, as the contract provided for payment of 80% of the engineer's monthly estimates of work done by him in compliance with the plans and specifications.

Neither is there any merit in the contention of appellees that the judgment should be affirmed without reference to the court's findings of law and fact, because of an absence of proof of damage to the district, and we shall also dispose of this question before taking up the more troublesome one as to whether or not both defendants were released from their obligations under the contract by reason of a failure upon the part of the plaintiffs to give notice of a purpose to rescind the contract before reletting the work to another.

The contract as amended provided that the contractor was to receive 14¼ cents per cubic yard for soft dirt ex-

cavations, and 2½ times that amount or 35⅝ cents per cubic yard for hardpan or hard dirt excavations. In proof of damages, the plaintiff showed that they were required to pay Church for doing the work originally let to the Peterson Company, a flat rate of 22 cents per cubic yard for both soft and hard dirt excavations, estimated at 107,085 cubic yards, but found by actual measurement to be 108,383 cubic yards; that this price was reasonable and the best that could be obtained.

Obviously, under the Peterson contract the cost would depend upon the relative amounts of soft and hard dirt excavated, and to ascertain which contract was more expensive to the district it would be necessary to know the quantity of each kind of earth left unremoved by the contractor. It is insisted for appellees that this information was in the keeping of the plaintiffs and they made no effort to furnish it. It is true that plaintiffs did not prove this essential fact, but defendants brought out upon the cross-examination of Mr. Poole, the engineer in charge of the work, that Peterson's contract was estimated to contain 3,005 cubic yards of hard earth and that he removed 2,336 cubic yards of same, and it takes only a simple calculation to show that according to the engineer's estimates there were but 669 cubic yards of hard dirt left unremoved by the Peterson Company, and for which it was to receive 35⅝ cents per cubic yard. It was therefore established by the proof that only 669 cubic yards of hard dirt were left unremoved by the Peterson Company; and that plaintiffs gained 13⅝ cents per cubic yard on this 669 cubic yards of hard dirt under the flat rate of 22 cents per cubic yard with the new contractor, but lost 7¾ cents per cubic yard upon 107,714 cubic yards of soft dirt, which shows a net loss to the district of $8,236.68 on excavation work.

Then again the proof shows a loss of $5.20 an acre on clearing 24.62 acres of right-of-way, or $180.02 on this item. Adding these two items together, the evidence shows, we think very satisfactorily, an actual loss to the district of $8,416.70, and disregarding other items they attempted to prove, but which in our judgment they did not sustain, plaintiff should have had judgment for this amount with interest and costs, less the 20% retained on monthly estimates, unless, as held by the trial court, defendants were released of liability therefor by plaintiff's failure to give defendants notice of their intention to re-

scind the contract and a reasonable opportunity to perform it before reletting the contract to Church.

This brings us to a consideration of the only question presented by the record that in our judgment is at all troublesome. The facts with reference to this question are in the main undisputed, and are as follows: The notice for the letting, as well as the contract with the Peterson Company, provided for the excavation of 161,-207 cubic yards of dirt, the clearing of 126.48 acres of right-of-way, and the construction of two wooden bridges; and, that all of such work should be completed in compliance with the plans and specifications "and finished in the year 1919."

The contract was executed on February 3, 1919, the contractor actually began work thereunder in June, and by the middle or last of November, when the work ceased, had excavated but 34,046 cubic yards of dirt and cleared 66½ acres of the right-of-way. Its ditching engine was so defective, or unsuited for the work, that it was out of order and work was suspended during much of this time. The company, for some time before November, had been anticipating the 80% due it monthly for work done, by issuing orders on the drainage commissioners to its creditors. The superintendent originally in charge of the work left the state about October 1st and never returned. The man left in charge was not furnished with sufficient means or equipment to prosecute the work with any degree of diligence. Many bills for both labor and material were unpaid, suits against the contractor and attachments against its equipment were filed. The company was a non-resident of this state, and hopelessly insolvent when, about March 1, 1920, it executed to its attorney at its home office in Chicago a bill of sale for its ditching machine, subject to an attachment that had been levied thereon. No work was done, or a good faith effort to work made after the latter part of November, and there was neither rain nor flood that would have interfered with or stopped work for more than a day or two at a time, if at all.

With matters in this condition, the drainage commissioners, on April 3, 1920, after due advertisement, relet the contract to complete the ditch to J. H. Church.

Previous to the reletting and executing of the new contract, and before the execution of the bill of sale to the contractor's Chicago attorney for its ditching ma-

·chine, the following letters were exchanged between the drainage commissioners and the Peterson Company and its surety, the Southern Surety Company:

Letter of January 7, 1920, from the drainage commissioners to the Peterson Company:

"Gentlemen: You are now and hereby advised that under the terms of your contract made and entered into on the 3rd day of Feburary, 1919, with the undersigned board of drainage commissioners in and for Hopkins county, Kentucky, that you would build, excavate and construct Otter creek public ditch in all respects conforming to the plans and specifications of J. V. Poole, engineer in charge of such construction, and all such work to be completed in accordance with your proposal and in compliance with such plans and specifications and finished in the year 1919, and the year 1919 having expired and such work not having been completed, we are writing to inquire what, if any, reason you have to offer in explanation of your failure to complete said work in accordance with said contract.

"You are further advised that in the execution of said contract and in compliance with the laws of the state of Kentucky governing and controlling drainage, you caused this said contract to be signed by Southern Surety Company as your surety in undertaking to indemnify the said board of drainage commissioners in the event of your failure, and convenanting and agreeing that you would faithfully do, keep and perform in all respects your said contract and undertaking, and we are by this same mail addressing a similar communication to your said surety asking it to advise whether it is now in position to carry out its undertaking and to guarantee and ·indemnify the said board of drainage commissioners for your failure to complete this work within the time agreed and under the terms stated.

"Awaiting your early and prompt reply, we are."

Letter, dated January 13, 1920, to the drainage commissioners from the Peterson Company:

"Gentlemen: In reply to your letter of January 7th, 1920, referring to our contract with your board, we will say that, as you know, work on this job was delayed unavoidably by the heavy floods which prevented prosecu·· tion of the work at a time when we had hoped to make particularly good progress.

"Then, furthermore, when we struck hardpan the task imposed upon our machine overtaxed its capacity. We are at present making arrangements for procuring of new parts and of repair parts, and when these contemplated improvements are installed upon the machine, we can and will resume operations.

"We delayed answering your letter for a few days hoping we would be able to specify a definite date at which a resumption of the excavation might be promised. The most we can say now, however, is that by next week we ought to know just when the new parts can be expected and machinists started to your county to do the repairing, and the minute the repairing on the machine is done we will start digging again.

"In view of the fact that we will have to buy many thousands of dollars' worth of supplies from time to time as the work progresses, and must obtain these supplies on credit from different sellers who expect, directly or indirectly, to receive their pay out of what is due or to become due to us under the contract, and in view of the further fact that some of the people upon whom we must depend know that some dispute might arise because of the failure to complete the work within the year 1919, we think your board ought to make a new agreement with us extending the time for completion of the job, for we want to go ahead and finish the work and presume your board wants it done just as promptly as possible, and a formal extension of the time within which the work may be completed will allay the fears of some people upon whom we must depend for materials and supplies when we resume work."

Drainage Commissioners' reply to the above, dated January 17, 1920:

"Gentlemen: We are in receipt of your two letters of recent date relative to the resumption of work on Otter creek ditch. Since we have had no formal reply to our letter to the Southern Surety Company, we are not now in a position to say anything definite in reply to your letters. After we have heard from the surety company we will give consideration to your proposition and let you hear from us."

Letter of January 7th, 1920, from drainage commissioners to Southern Surety Company:

"Gentlemen: We are addressing this communication to you for the purpose of calling your attention to

the fact that on the 3d day of February, 1919, as the surety for H. J. Peterson Company you entered into covenant with the undersigned board of drainage commissioners in and for Hopkins county, Kentucky, that the said H. J. Peterson Company would well, truly and faithfully perform, do and keep in all respects its contract and undertaking mentioned in said writing, and that if it should fail in anywise in the performance of such contract, then you should pay to the said board of drainage commissioners all damages sustained not exceeding fifty per cent of the amount of the contract price, viz., $27,108.70, and you are further advised that under the terms of said contract all of said work was to be completed in the year 1919, and said year having expired and the said undertaking being far from having been completed, in fact not more than one-fourth of the work undertaken to be done has been accomplished and much of that not conforming to the specifications, we are now desirous of knowing if it is your purpose to make good your undertaking without any litigation, and we shall be pleased to have you advise us at once what you propose to do respecting this work.

"We shall be pleased to receive prompt and immediate reply."

Letter of Southern Surety Company to the drainage commissioners, dated January 10, 1920:

"Gentlemen: We acknowledge receipt of your letter of January 7th, advising that the H. J. Peterson Company have not completed its contract covered by our above numbered bond. We have no information concerning the matter except the last report from the Peterson Company advising that operations had been greatly delayed because of the unusual character of the soil encountered and because of unusual high water, etc.

"We shall investigate the situation and advise you further."

Letter of Southern Surety Company to the drainage commissioners, dated January 15, 1920:

"Gentlemen: Replying to your letter of January 7th, calling attention to the contract of H. J. Peterson Company, will advise that our Chicago representative had had this up with our principal, H. J. Peterson Company, and they advise that the most difficult portion of the work has now been done; that the delay has been caused by unavoidable matters and that they expect, as

soon as the high water goes down, to renew their work and complete same as rapidly as possible.

"We have every reason to believe that the Peterson Company will carry out this promise and will be on the job in the early spring."

To arrive at an understanding of what the parties intended and were understood to mean by these letters, the facts and circumstances under which they were written, as already stated, must of course be kept in mind. In this light it is perfectly plain, we think, that the letter of January 7th to the contractor was meant, and could not but have been understood to mean, that it was called upon to explain promptly, if it could, its apparent abandonment of the contract, and to proceed at once with its completion if it ever intended to do so. The answer of the contractor not only failed utterly to explain its suspension of work upon any other hypothesis than an abandonment thereof, but made the promise which it did not fulfill, and which the evidence shows conclusively it never intended to fulfill, that it would renew work on the contract "the minute the repairing on the machine" could be done.

Although this letter was written on January 13th the contractor never repaired its dredge or resumed work; upon the other hand, on March 1st it sold the dredge, and not only made no further effort to perform its contract but was utterly unable to do so because of insolvency.

It is equally as plain, we think, that the letter of January 7th to the surety company was meant, and understood to mean, that the surety was notified of its principal's breach and apparent abandonment of the contract, and required to make it known promptly whether or not it intended "to make good your undertaking without litigation," or state what it proposed to do in the matter.

Answering these demands, the surety company first promised to "investigate the situation" and advise, and then after investigation, wrote plaintiffs that "the most difficult portion of the work has now been done," that the delay had been unavoidable, and that it had "every reason to believe that the Peterson Company . . . will be on the job in the early spring." This letter not only failed to make any answer whatever to either of the demands made upon the surety company, but misstated the facts with reference to the condition of the work and the cause of the delay, and in addition showed plainly that

the surety company intended to do nothing whatever with reference to the performance of the contract, but would rely upon its belief that the Peterson Company would resume work at some indefinite time "in the early spring."

In these circumstances, was it incumbent upon the plaintiffs to give the defendants formal or additional notice of an intention to rescind the contract, as is appellees' contention, or were they justified in treating the contract as having been abandoned and reletting its performance to another without further notice to the defendants, as is the contention of appellants?

Upon authority cited fully sustaining the text, we find this statement of the law, which we think is applicable upon this inquiry, in 13 C. J. 657:

"In some cases a breach of the contract by one party may be of such character as to permit the other party to abandon it and sue at once for entire damages. Such an abandonment is to be distinguished from a technical rescission, in that the contract may still be resorted to by the party for the purpose of fixing the damages which he has sustained by reason of the breach occasioning the abandonment of performance. Notice to the party in default of the intention to claim damages is unnecessary. . . .

"To permit an abandonment, it is necessary that the failure of performance go to the substance of the contract, and it would seem that, where there is no distinct refusal by the party in default to be bound by the contract in the future, his conduct must be such as to show that he does not intend to fulfill its obligations."

In further explanation of practically the same statement of law, it is said in 6 R. C. L., page 930:

"But the breach of contract which will justify the party not in default in abandoning performance and suing for damages on account of a breach by the other need not be of such character as to render the further execution of the contract by him impossible. If the other party refuses to treat it as subsisting and binding upon him, or by his act and conduct shows that he has renounced it and no longer considers himself bound by it, there is in legal effect a prevention of performance by the other party. It would seem to be reasonable and just, that upon the repudiation of the contract by one party, the other shall be held justified in ceasing performance . . . and to permit recovery once for all

of the damages that the injured party will sustain by the nonperformance of the other party. . . . While the conclusion should not be made to rest upon grounds of convenience of the parties, however just and equitable, yet, the defendant should not be heard to complain if, after acts and declarations evincing a clear determination to be no longer bound by or to perform the contract on his part, the other party treats it as abandoned by him. . . . In such case it can make no difference whether a contract has been partially performed or the time for performance has not yet arrived.''

Applying these principles—which are supported by ample authority and thoroughly sound—to the facts of this case, we have no hesitancy in concluding that there was such an abandonment of the contract by the defendants as amounted to a repudiation thereof and warranted the plaintiffs in treating it as abandoned when they relet the work to another on February 3d, 1920, and in suing for recovery, once for all, of the damages sustained by them by reason of the nonperformance.

In this view of the law it is not necessary to decide whether or not the provision in the contract for its completion during the year 1919 was of the essence of the contract by reason of the requirements of subsections 26 and 28 of the drainage act, as is contended by appellants with some plausibility at least, and the decision of that question is now expressly waived.

Wherefore the judgment is reversed, and the cause remanded for a new trial consistent herewith.